(Nos. 27883, 27884.—

THE PEOPLE *ex rel.* Harry A. Little, County Clerk, Petitioner, *vs.* PHILIP W. COLLINS, Director of Revenue, Respondent.—THE PEOPLE *ex rel.* George A. Hunter, County Clerk, Petitioner, *vs.* PHILIP W. COLLINS, Director of Revenue, Respondent.

*Opinion filed March 14, 1944—Rehearing denied March 23, 1944.*

John J. Bresee, State's Attorney, of Champaign, and Taylor Wilhelm, State's Attorney, of Ottawa, for petitioners.

Vernon W. Foster, R. C. Beckett, and Sidney F. Blanc, all of Chicago, (Henry I. Green, of Champaign, and Bruce A. Campbell, of East St. Louis, of counsel,) for intervening petitioners.

George F. Barrett, Attorney General, (William C. Wines, of counsel,) for respondent.

Jacob Shamberg, of Chicago, for intervening respondent.

Thomas J. Courtney, State's Attorney, Barnet Hodes, Corporation Counsel, Richard S. Folsom, John O. Rees, Ernst Buehler, and George Basta, (William J.

Tuohy, Joseph F. Grossman, Otho S. Fasig, Emmett Harrington, Lawrence Fenlon, Richard Rudolph Young, and Philip Lozowick, of counsel,) all of Chicago, for *amici curiae*.

Mr. Justice Fulton delivered the opinion of the court:

In this consolidated case two original petitions for *mandamus* were filed. The relators are George A. Hunter, county clerk of the county of LaSalle, and Harry A. Little, county clerk of the county of Champaign, Illinois. The action is brought against Philip W. Collins, Director, Department of Revenue of the State of Illinois. The purpose of each petition is to compel the respondent to certify to them as county clerks the assessments alleged to have been completed and published by the Department of Revenue for the year 1943, of the properties of the various railroads and of the capital stock, including franchises of the various corporations located in their respective counties. Leave was granted to file in the first instance by virtue of section 2 of article VI of the Illinois constitution which provides: "The Supreme Court * * * shall have original jurisdiction in cases relating to the revenue, in *mandamus* and *habeas corpus*, * * *." State-wide interests and duties of a high official affecting the public at large are clearly involved and thus our original jurisdiction should be exercised. *People ex rel. Kocourek* v. *City of Chicago*, 193 Ill. 507; *People ex rel. Taylor* v. *Board of Education*, 197 Ill. 43.

Respondent, Philip W. Collins, appeared and filed an answer. Thirteen railroad companies owning property in one or both of the said counties were permitted to intervene and to file briefs in support of the petitions. The county of Cook, the city of Chicago and four other taxing bodies in Cook county, Illinois, were given leave to file a brief as *amici curiae*, and an individual taxpayer, Harry A.

Bollman, was granted leave to intervene and file a brief as a party respondent in opposition to the petitions for writs of *mandamus*.

The answer of the respondent was duly filed and the petitioners and intervenors in support of the petitions filed a motion to strike the said answer and for judgment on the pleadings. The cause is now at issue and submitted on the petitions, the answer and the motion to strike the answer, (said motion being treated as a general demurrer to the answer,) and the printed briefs and arguments. On this state of the pleadings the facts well pleaded in the answer, as distinguished from conclusions of the pleader, must be taken as true. Because the case must be decided on the pleadings alone, the allegations thereof will now be referred to rather extensively.

The petitions aver that the relators are the duly elected, qualified and acting county clerks, respectively, of the counties of LaSalle and Champaign; that by law they are charged with the duty of extending upon the tax books of their respective counties all taxes levied in said counties for the revenue year of 1943, payable in 1944; that the respondent, Philip W. Collins, as Director of the Department of Revenue, is the officer who is charged by law with the duty to execute the powers and discharge the duties vested by law in said department; that one of the duties of the said Director is to assess all property owned or used by railroad companies operating within the State of Illinois as of April 1, annually, and to equalize and distribute the value of the property of every railroad company (other than non-carrier real estate) to the taxing districts entitled thereto and to certify the same to the county clerks of the respective counties who shall extend taxes against such values the same as against other property in such taxing districts; that it is also the duty of the said Department of Revenue to assess the capital stock, including franchise of all companies incorporated under the laws

of Illinois with certain exceptions, and to certify such assessments of capital stock to the county clerks of the respective counties in which such companies are located; that under the provisions of section 137 of the Revenue Act of 1939, as amended, it is the duty of the Department of Revenue upon the completion of the original assessments to publish a full and complete list of such assessments in the State official newspaper; that during the year 1943, and on October 2 and 11, respectively, assessments of capital stock and railroad property were completed and published in the State official newspaper; that in addition to the specific valuations said publications contained these further statements, respectively: "Such net assessment is the excess of equalized value of the capital stock, including the franchise, over the equalized value of the tangible property as assessed by the local assessors." "The foregoing assessments have been equalized at the State-wide average of 31 per cent."

The petitions further allege that such assessments so published were final assessments and constitute a completion and fulfillment of the powers and duties imposed upon the said department and that after such completion and publication of assessments no power was granted to the Department to make any increases in such assessments, and that the Department of Revenue has no further duties with reference to such assessments other than to distribute and certify to the county clerks of the respective counties in which the assessed properties are located, the amount and distribution of such assessments among the respective taxing districts within the several counties; that any petitions for review and correction which may have been filed have been disposed of.

The petitions further aver that several county clerks in the State of Illinois wrote the Department of Revenue inquiring as to when the railroad and capital stock certifications would be made to their counties, whereupon the

Director of Revenue wrote the relators and all other county clerks in the State of Illinois stating that on November 3, the Department was preparing to mail out its certifications to the various county clerks when the Director learned that the county assessor of Cook county had announced that he intended making a large increase in the assessments of property in that county by discontinuing the practice previously existing for a great many years of equalizing assessments at thirty-seven per cent of the full value thereof and instead he announced the intention of assessing property in that county at the full actual value thereof. This letter from the Director of the Department of Revenue was dated December 1, 1943.

The petition quotes the following portion of said letter as a basis for the conclusion that the Director of Revenue felt this action on the part of the assessor of Cook county would have the effect of making a substantial and unforeseen increase in the State-wide average ratio of assessment: "Before the Department can proceed to make a formal finding of the revised assessment ratio in Cook county and, therefore, a revised statewide assessment ratio, it must await the completion of the real estate assessment in that county and certification of the books to the County Clerk. Immediately that this has been done, the Department will determine the statewide average and proceed to republish its assessments, hold hearings, and thereafter certify the revised valuations to the various counties * * *."

The petitioners further allege that the Director of Revenue has failed and refused to certify said completed and published assessments of October, 1943, which it was his mandatory duty to do without unreasonable delay. The petitions then set up in detail the difficulties and hardships that will occur to the counties in which relators are the county clerks, as well as other counties in Illinois, if there be any further delay, and that the delay in certification has hindered them in the performance of their duties as county

clerks in relation to the extension of taxes. The prayers for relief are that a writ of *mandamus* issue directing the respondent, Philip W. Collins, Director, Department of Revenue, to certify to the relators, as the county clerks of their respective counties, the assessed valuations theretofore made by him for the year 1943, on the properties of the various railroads located in said counties, and the assessments made by him on the capital stock of corporations assessed by him, all in accordance with the original assessments so made and published in October, 1943.

The answer of the respondent in behalf of the Department of Revenue admits the first five paragraphs of the petitions but sets up new matter and facts in reply to paragraphs 6 and 8. Paragraph 6 of the petitions avers the following: "6. That such assessments of railroad property and of capital stock are referred to in the statutes as 'original assessment of property' by the Department of Revenue and will be jointly so referred to hereinafter." The respondent in its answer asserts that said paragraph contains no material factual allegations and that the conclusion of law stated by the petitions is wholly inaccurate. It then admits that the assessment of railroad property and the assessment of capital stock required to be made by the Department are referred to in sections 137 and 146 of the Revenue Act of 1939, as amended, as "original assessments," but denies that the assessments required to be certified to the county clerks pursuant to section 151 of the said act are referred to as "original assessments," but, on the contrary, avers that the assessments to be certified to said county clerks pursuant to section 151 are the assessments as equalized by the Department, pursuant to section 146 of the said Revenue Act of 1939.

The greatest controversy in the pleadings arises over paragraph 8 of the petitions and the answer of the Department thereto. The said paragraph 8 makes the following averments: "That pursuant to the said powers and duties

under the statutes as hereinabove set out the Department of Revenue of the State of Illinois did, prior to October 11, 1943, make and complete its original assessments and publish the same in the state 'official newspaper,' to-wit, the Illinois State Journal, the railroad assessments being published in one list, a true and correct copy of which is attached as Exhibit A, and the capital stock assessments were published in two lists, a true copy of one of which (omitting the names and amounts of assessments of many individual companies, covering several newspaper pages) is hereto attached as Exhibit B."

In reply to this paragraph, the respondent answers that "the said Department of Revenue, at the time of said purported publication had not received complete abstracts of property assessments from the county clerks of all, or of four-fifths of the counties of the State of Illinois, [referring to the requirements set forth in section 146 of the Revenue Act of 1939, as amended] and had not, in fact, equalized said assessments contained in said purported publication, or determined the State-wide average ratio of the percentage factors utilized by the local assessing officer in all or in four-fifths of the counties of the State of Illinois, in the assessment of property subject to assessment by said local assessing officers;" all of which were nevertheless required by said section 146. It is further stated in the answer to said paragraph 8 that it was not until on, to-wit, December 28, 1943, that the Department of Revenue had received complete abstracts of property assessments from the county clerks of four fifths of all the counties of the State of Illinois. By reason thereof the answer concludes that the original publications of railroad and capital stock assessments made on or prior to October 11, 1939, were inadvertently, improvidently and erroneously made and did not comply with the provisions of the Revenue Act of 1939, and were not a fulfillment of or compliance with the duties of the Department of Revenue,

as prescribed by law, and that said publications were "illegal and void and of no effect whatsoever."

It is insisted by petitioners that the above allegations tender an issue of law as to whether the original publications made on, or prior to, October 11, 1943, were illegal and void because made by the Department of Revenue before complete abstracts of property assessments had been received from the county clerks of four fifths of the counties in the State of Illinois.

In further answer to said paragraph 8, the respondent avers that on January 17, 1944, the Department of Revenue published in the Illinois State Journal, the official newspaper of the State of Illinois, full and complete lists of the original assessments made by it, setting forth the value of railroad property and capital stock and franchises at their actual and fair cash value determined in the manner prescribed by law. Attached to the answer are copies of a portion of the new publications which purport to set forth original assessments representing the full fair cash values of all railroad property in Illinois, the full fair cash value of the capital stock, including franchise, of corporations subject to original assessment by the Department, and each contains the following statement: "The above assessments are subject to equalization, as provided by law, at the State-wide average ratio."

The answer also states that the Department is now in the process of equalizing its original assessments of railroad property and capital stock so published on January 17, 1944, as required by law, and in determining the State-wide average ratio in conformity with the rule laid down by this court in the case of *Mobile and Ohio Railroad Co. v. State Tax Com.* 374 Ill. 75; that from the information it now possesses at the time of filing answer, it has been definitely ascertained that the State-wide average ratio for equalization purposes will greatly exceed thirty-one per cent. While the answer admits and denies the other alle-

gations of the petitions, the controversy arises over the matter contained in reply to paragraphs 6 and 8 of the petitions.

The motion to strike the answer filed on behalf of the petitioners and intervening railroad companies states that the answer is substantially insufficient in law and asks that writs of *mandamus* be issued as prayed in the original petitions; that the answer, by admitting all allegations of fact contained in the original petitions and alleging new matter in defense, is in the nature of a plea of confession and avoidance and that the new matter contained in paragraph 8 of said answer is irrelevant, incompetent and immaterial and constitutes no defense to the petitions for writs of *mandamus*.

Before proceeding with a further discussion of the case it appears desirable for the sake of brevity to hereafter refer to the two petitioning county clerks and the thirteen intervening railroads as "petitioners" for their contentions are identical. Likewise, the six taxing units in Cook county which have filed a brief as *amici curiae* and Harry A. Bollman, an intervening taxpayer, will be considered as included in the word "respondent." The various sections of the Revenue Act of 1939, as amended, will be cited by original section numbers without further reference to the corresponding paragraph number of our 1943 Illinois Revised Statutes.

From the above statement of facts it is apparent that if the original publications made on and prior to October 11, 1943, are improper and of no effect whatsoever, admittedly the writs of *mandamus* should not issue. On the other hand, if said original publications are not to be cast aside but are deemed to be complete and final, then the writs of *mandamus* should be issued in accordance with the prayer of the county clerks' petitions.

To summarize, it is the contention of the petitioners that upon the completion and publication of the assess-

ments on and before October 11, 1943, in the State official newspaper, such assessments became final and binding upon the Department of Revenue and cannot be changed except upon a petition for review and correction filed by the taxpayer within ten days of the date of such publication. Respondent contends that there is no clear legal duty shown by the petitions, answer and demurrer why he should be commanded by a writ of *mandamus*, to distribute and certify the assessment of railroad properties and capital stock equalized at 31 per cent because the Department of Revenue made a publication in October, 1943, listing such properties at 31 per cent of their full fair cash value and indicating that the State-wide average ratio for equalization purposes was 31 per cent, when, as a matter of fact, the pleadings show the actual State-wide average ratio greatly exceeds 31 per cent; that at the time of the October publications the Department had not received abstracts from four fifths of the counties, but that on January 17, 1944, the Department for the first time published its original assessments, made at 100 per cent of the full fair cash value of said properties and is now in the process of equalizing and is prepared to certify the same at the correct State-wide average ratio. Thus, while the issue in this case might technically be resolved into a question of whether the values in the capital stock publication of October 2, 1943, and the railroad publication of October 11, 1943, should forthwith be certified to the respective county clerks, it is really broader than that and involves other related issues.

First, as to the meaning of "original assessments" appearing in section 137 which provides as follows: "Upon the completion of the original assessments to be made by the Department, it shall publish a full and complete list of such assessments in the State 'official newspaper.' Any person or corporation feeling aggrieved by any such assessment may, within ten days of the date of publication of

such 'official newspaper' containing such list, apply to the Department for a review and correction of the assessment complained of. Upon such review the Department may make such correction, if any, therein as may be just and right." (Ill. Rev. Stat. 1943, chap. 120, par. 618.) Petitioners contend that the term refers to assessments over which the Department of Revenue has original jurisdiction and consequently publications should be of valuations as equalized by it since it also has that power. On the other hand, respondent asserts that "original assessments" include no more than the term indicates and is restricted to full fair cash values before any equalization factor is applied. Petitioners further argue that assessment and equalization should be, and in general practice are, combined as one process which results in the published equalized values the public has come to understand. "Assessment," replies the respondent, is one thing while "equalization" is quite another; a separate act and procedure in fact.

In our opinion it is perfectly obvious that the term "original assessments" as used in section 137 refers to assessments over which respondent has original jurisdiction. That would be the normal meaning of the term and is consistent with its use in many other sections of the Revenue Act. Thus, in section 163, reference is made to "all property originally assessed by the Department" in connection with the levy of a State tax. Sections 140, 141 and 143 refer to "original assessments" in providing the duties of local assessing officers. In all instances the term is used, as in ordinary parlance, to mean assessments which a particular officer or body has the duty of making in the first instance. None of these references, however, and no amount of play on words as contained in the briefs of all parties, throw any light on the question of whether the term might, nevertheless, mean "equalized assessments." That 100 per cent values should be determined in the first

instance is apparent from the following sections of the Revenue Act:

"20. * * * (1) Each tract or lot of real property shall be valued at its fair cash value estimated at the price it would bring at a fair, voluntary sale. * * *

"21. * * * (1) All personal property * * * shall be valued at its fair cash value. * * * (4) The capital stock of all companies and associations created under the laws of this State, except companies and associations organized for purely manufacturing and mercantile purposes, or for either of such purposes, or for the mining and sale of coal, or for printing, or for the publishing of newspapers, or for the improving and breeding of stock, or for banking, or for buliding and loan purposes, shall be so valued by the Tax Commission as to ascertain and determine, respectively, the fair cash value of such capital stock, including the franchise, over and above the assessed value of the tangible property of such company or association."

"80. The Department shall assess all property owned or used by railroad companies operating within this. State, as of April first annually, except property found by the Department to be non-carrier real estate as hereinbefore defined. The Department shall, in determining the fair cash value of the property assessed by it, value all·the property of any railroad company as a unit, but shall make due allowance for any non-carrier real estate."

"162. * * * The full fair cash value of all property as ascertained and set down in accordance with this Act,. shall be the assessed valuation for all purposes of taxation, limitation of taxation, and limitation of indebtedness prescribed in the Constitution or any statute."

Nowhere do we find that the sections directing publication of values include any suggestion that the publication shall be at equalized valuations. While it is has long been generally known that the customary practice of as-

sessing officers is to evaluate and publish at a figure less than the full fair cash value of the property involved, still we have been referred to no section of the Revenue Act or court decision condoning or approving this procedure as the proper initial step in taxation. It is apparent from this very case what difficulties may be encountered when such a departure from the strict letter of the law occurs. Had the valuations published on October 2 and October 11 been the full fair cash value as contemplated by the above-quoted sections of the Revenue Act, then no amount of changes by the 102 counties in Illinois of their standards of assessments could have brought about the near state of chaos which now exists. Had the October publications been at the full fair cash value of railroad property and capital stock, the Department of Revenue would have been able to certify the equalized valuations when the ratios from the principal counties, if not all of them, became known to it. It would always be a simple matter to revise the equalization factor up or down provided the Department of Revenue has full values to base it upon. However, once equalized valuations are fixed, the Department is powerless to revise the equalizing factor *upwards,* in the event that procedure becomes necessary or proper, if we adopt petitioners' definition of "original assessments" as the correct premise.

By an admission of the intervening railroads themselves, the State Tax Commission published the full fair cash values of railroad property and capital stock for the year 1939 when the case of *Mobile and Ohio Railroad Co.* v. *Tax Com.* 374 Ill. 75, was pending in this court. That was done because it was in doubt whether the railroad assessments should be equalized on the State-wide average ratios or on the various county ratios. The former procedure this court found to be correct as appears from the decision in said case. We find no suggestion that any hardship was suffered by any railroad as a result of the

full value publications in 1939, and we see no reason why the same procedure should not be followed for 1943 and subsequent years, unless or until the legislature amends the present Revenue Act. By publishing the full fair cash values the Department of Revenue is then in a position to certify the equalized values by using such factor as appears to be proper when the ratios and valuations used in the respective counties are ascertained by it. This appears to us to be the more orderly procedure and maintains the distinction between *assessment* and *equalization* rather than combining the two as a single act. Thus, in the case of *Union Pacific Railroad Co.* v. *Board of Comrs.* 35 F. (2d) 785, (*certiorari* denied in 281 U. S. 734,) the court said: "Again, valuing property of a particular taxpayer, as a whole, is in its essence assessment of such taxpayer's property. While dealing with, and raising and lowering the value of classes or sub-classes of property without reference to ownership, within a designated territorial limit, is in its essence equalization. Assessment is personal, while equalization is impersonal." While that case involved somewhat different statutes of Colorado, yet it indicates the distinction which we believe all authorities concede.

Recognition of this essential difference would result in no hardship to intervenors or those similarly situated because they would not only have the right of appeal from the original assessment thus published but they would also be able to challenge the equalization factor ultimately used by the Department if the same were improperly calculated or applied. Such follows from the case of *People ex rel. Thornell* v. *Wabash Railway Co.* 379 Ill. 454, wherein taxes were ordered refunded in an amount represented by the difference between the correct equalization factor and the higher ratio first used by the Tax Commission. See, also, *People ex rel. Hempen* v. *Baltimore and Ohio Railroad Co.* 379 Ill. 543, *People ex rel Ross* v. *Chicago, Milwaukee, St. Paul and Pacific Railroad Co.* 381 Ill. 58, and

*People ex rel. Ross* v. *Chicago, Burlington and Quincy Railroad Co.* 381 Ill. 374.

In view of the conclusion that "assessment" and "equalization" is each a separate process or function, it becomes unnecessary in this case to resolve the dispute as to whether sections 79 to 90 or sections 130 to 152 govern the precise method which the Department should follow in equalizing 100 per cent valuations for certification to the various county clerks. The first-mentioned sections were originally a part of the Railroad Assessment Act and section 86 makes general references to valuating and equalizing railroad properties. Petitioners claim these control. Respondent suggests that the Department should follow the latter provisions, particularly section 146 which requires abstracts of property assessments from at least four fifths of the counties to be submitted to the Department before it can proceed to equalize. The method of fixing equalizing factors was treated quite fully in the well-known case of *Mobile and Ohio Railroad Co.* v. *State Tax Com.* 374 Ill. 75, from which it further appears that a rather well-established procedure has been conceived by the Department. The process of equalizing has been carried on first by the State Board of Equalization, then the Tax Commission, and now the Department of Revenue, over a period of many years, and we have every reason to believe that the body charged with this far-reaching responsibility will continue to do everything humanly possible to arrive at fair, lawful and proper equalizing factors.

Without going into the matter further or passing directly upon the applicability of section 146, we might yet observe that the reasons behind requiring at least four fifths of the abstracts to be submitted before equalization can be commenced could well apply with equal force whether a levy on railroads or a State tax is to be made. Uniformity could be thus more nearly achieved and guesswork reduced to a minimum. By following such procedure

the issuance of tax statements would no doubt be speeded up also because county taxing officials would realize that unless the Department of Revenue has the required abstracts it cannot equalize or certify. Very likely this is the method long ago devised under section 86 and other pertinent provisions of the so-called Railroad Assessment Act. Obviously, neither by these suggestions nor by anything contained in this opinion do we undertake to pass upon the correctness of any State-wide equalizing factor ultimately determined by the Department; or how or to what it shall apply, other than may have been already directly decided by this court.

Having found that the publications required by the Department under section 137 should be at full fair cash values and not at equalized values, and having determined that equalization by the Department should be performed as a separate act, we have now to consider whether the new publications made on January 17, 1944, were legal and proper. Or, to put the question more directly: Is it the clear legal duty of respondent, the performance of which is sought to be coerced by this court by a writ of *mandamus*, to distribute and certify the assessments of railroads and capital stock equalized at 31 per cent because the Department of Revenue made publications in October, 1943, listing such properties at 31 per cent of their actual full fair cash value, even though at the time of said publications the Department did not have complete information from which to calculate the equalizing factor? We feel compelled to answer in the negative. We believe that the Department of Revenue is a continuing body with continuing duties. Its duty to publish the assessment made by it is a continuing duty and is not affected by the fact that an earlier, insufficient or illegal publication has been made. (*People ex rel. Yarrow* v. *Lueders,* 287 Ill. 107; *State Board of Equalization* v. *People ex rel. Goggin,* 191 Ill. 528; *People ex rel. Illinois Midland Railway Co.* v. *Su-*

*pervisor,* 100 Ill. 332.) This court can only enforce the statutes as the same are enacted by our legislature if we are to fulfill the duties of the judiciary only, which we must and ought to do. Enforcement of laws naturally involves interpretation of them. But, such interpretation must be in the light of related or connected sections and with a view to effecting the apparent purpose of the legislature.

Under the Revenue Act of 1939, it is specifically the duty of the Department of Revenue to assess certain properties and assets at their full fair cash values. We cannot become a party to an obliquity from the law as enacted. As was appropriately said in the case of *People ex rel. Pollastrini* v. *Whealan,* 353 Ill. 500: "It need not be observed that the writ of *mandamus* is not available to coerce a public officer to violate the law and to incur the consequent penalties." As we read the statutes involved, it is the duty of the Department to make original assessments upon a full fair cash basis and it is these same assessments which section 137 requires to be published. If equalization is intermingled with assessing, we believe it must be apparent to all that full fair cash values will be lost sight of. Whether the October publications made by the Department of Revenue were the result of inadvertence, oversight, a misconception of the statutes involved, or an adherence to custom because offering the path of least resistance, there still is no reason why the statutes should not be complied with once the matter is brought to our attention. One deviation from the letter of the law by no means warrants or condones another.

The fact remains that no certifications have yet been made to the respective county clerks, and it appears from the pleadings that certifications based on presently known ratios can as readily be made now as certifications based upon the equalized values first published. While it is true that the statute makes no provision for a second publication when the first was erroneous or improperly made,

still we find no prohibition against it and see no reason for refusing to concede the validity of a new publication now that the necessity has arisen and the omission to follow the statute ascertained. While petitioners urge with no little force that the October publications became final after the expiration of ten days, yet in so doing they overlook the basic requirement that there must first be an assessment and publication at the full fair cash values of the properties and assets involved. It is inconceivable that an unauthorized act can constitute the fulfillment of an official duty so as to preclude the authorized act at a later date. We appreciate that courts will not take jurisdiction to review an assessment until the assessment order is final, and that section 138 provides for an appeal to the circuit court upon ten days' notice, which provision indicated finality. However, it was clearly pointed out in the case of *People ex rel. McDonough* v. *Illinois Central Railroad Co.* 355 Ill. 605, that such remedy by appeal to the circuit court is not exclusive under the further provisions of the same section of the statute. Thus any railroad which might have just cause for complaint against the value published by the Department on January 17, 1944, will have adequate methods of recourse.

If instead of the publications made in October, 1943, the Department had inadvertently handed to the publisher of the State "official newspaper" the assessments for 1933, or any other wholly inappropriate schedule, certainly we all agree there would have to be new publications. By the same token, we believe it is only just and proper to permit a compliance with the law while at the same time resolving a dispute which has long existed but never before been directly passed upon. The fact that the question herein presented is difficult of decision and involves far-reaching results should not deter us from deciding the case squarely upon the law. Upon this same general problem, the court aptly observed in the case of *Mobile and*

*Ohio Railroad Co.* v. *Tax Com.* 374 Ill. 75: "It may be that the ideal is beyond attainment through available human agencies, yet the quest cannot be abandoned either by the legislative or judicial branch of government. * * * Making all due allowance for the frailties of human judgment, it is apparent that there remains a sediment of evasion and an avoidance of true valuations. Regardless of the cause or motivating factors bringing about these great inequalities, it has long been apparent to this court and to the legislature that the nearest approach to that perfection required by the constitution lies in the delegation of power of equalization to some such body as the State Tax Commission. Every one knows that this ideal has not been attained and yet we are compelled to strive for it."

In reaching the foregoing conclusion we believe no violence is done to such cases as *Barkley* v. *Dale,* 213 Ill. 614, *Kimball & Co.* v. *O'Connell,* 263 Ill. 232, and *People ex rel. Brecheisen* v. *Board of Review,* 363 Ill. 106, cited and strongly relied upon by petitioners. The sections of the Revenue Act there involved were different and did contain definite time limitations within which the boards of review could act. Under our decision herein no railroad or stock company will suffer irreparable damage, because adequate opportunities for relief, if justified, will still be open to them as hereinabove pointed out.

Believing the petitioners have not shown any clear legal right on this record to be entitled to writs of *mandamus,* the petitions for the same are hereby denied.

*Writs denied.*

Mr. JUSTICE STONE, specially concurring: I concur in the judgment entered in this case.